## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

(1) JAMES AND JUDY GRELLNER,
on behalf of themselves and all others
similarly situated,

                    Plaintiffs,

vs.

(2) MARATHON OIL COMPANY
(including affiliated predecessors and
affiliated successors),

                    Defendants.

Civil Action No. 16-CV-_1168-M_____

## PLAINTIFFS' ORIGINAL
## CLASS ACTION COMPLAINT

James and Judy Grellner ("Plaintiffs" or the "Grellners"), on behalf of themselves and the Class of all other persons similarly situated, file this Original Class Action Complaint against Marathon Oil Company ("Marathon"), and allege and state as follows:

## SUMMARY OF ACTION

1.     Plaintiffs and the Class bring claims against Marathon concerning Marathon's actual, knowing and willful underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells through improper accounting methods (such as not paying on the starting price for gas products but instead taking improper deductions) and by failing to account for and pay royalties, all as more fully described below.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over the claims asserted in this complaint pursuant to 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum of $5,000,000 and because Plaintiffs and Marathon are citizens of different states.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Marathon transacts business and is found within this District, and/or has agents within this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

## PARTIES

4.      Plaintiffs are citizens and residents of Oklahoma. Plaintiffs own royalty interests in Marathon operated wells that produce gas.

5.      Marathon is a corporation organized under Ohio law with its principal place of business in Texas and may be served with process by serving its registered agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, OK 73128.

6.      Marathon is in the business of producing and marketing gas and constituent products from the wells in which Class members hold royalty interests.

7.      The typical royalty payment is between 1/8th and 3/16th of a well's revenue.

8.      Marathon and its affiliated predecessors, successors, and current and past employees, agents, representatives, attorneys, or others acting on their behalf and all those to whose prior leasehold interests they have succeeded and for whom they are

legally liable whether by merger, assignment, or otherwise shall herein collectively be known as "Defendant" or "Marathon."

9.      The acts charged in this Complaint as having been done by Marathon were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Marathon's business or affairs, and within the scope of their employment or agency with Marathon.

## CLASS ACTION ALLEGATIONS

10.      Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons who own or owned minerals in the State of Oklahoma subject to an oil and gas lease from September 1, 2011 to the present, wherein (1) they received royalty on the sale and disposition of gas attributable to Marathon's interest in Oklahoma properties; and (2) their royalty payments were reduced as a result of the reduction of production volumes and/or production proceeds [expended] for marketing, gathering, compressing, dehydrating, treating, processing or transporting of hydrocarbons produced from the unit.  Excluded from the proposed class are agencies, departments or instrumentalities of the United States of America, or the State of Oklahoma, and/or persons whom Plaintiffs' counsel are, or may be prohibited from representing pursuant to the Rules of Professional Conduct, and/or overriding royalty owners and unleased mineral owners who have elected under an Oklahoma Corporation Commission forced pooling order to take the bonus/royalty option.

11.      The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.

12.     Marathon operates or has operated thousands of Class Wells that produce gas. Marathon holds a working interest in these Wells, with at least one, and usually multiple, royalty owners for each well.

13.     Marathon has within its possession or control records that identify all persons to whom it (including affiliated predecessors and those for whom it is legally responsible) has paid royalties from Class Wells during the Class Period.

14.     The questions of fact or law common to Plaintiffs and the Class include, without limitation, one or more of the following:

    a.    Whether the Plaintiffs and members of the Class are beneficiaries of the implied Marketable Condition Rule (MCR), which requires Marathon to sever the gas from the ground and to prepare the gas for market at Marathon's sole expense?

        i.    If so, whether: 1) the Midstream Costs of gathering, compression, dehydration, treatment, and processing (GCDTP) are costs associated with preparing the gas for market such that none of them should have been deducted from royalties but all of them were; or 2) whether the market for gas occurs before GCDTP are incurred such that the Class's claim is only for excessive deductions of Midstream Costs?

        ii.    If not, whether the Class members were party to a lease that expressly allows deduction of all of the GCDTP Midstream Costs ("Express Deduction Lease" or "ED Lease"), such that these Class members have a claim only for excessive deductions of Midstream Costs, and if so, whether the Midstream Costs actually deducted were excessive in amount?

    b.    Whether Marathon paid royalty to Plaintiffs and members of the Class for all valuable constituents coming from their wells and which inured to Marathon's benefit either: 1) through credit toward the Midstream Costs; or 2) by contractual consideration in-kind to a midstream company (such as drip condensate, helium, liquefied

4

nitrogen, some percentage of residue, some percentage of fractionated NGLs, plant fuel, or FL&U?

c.  Whether Marathon (including any of its affiliates) paid royalty to Plaintiffs and members of the Class based on a starting price below what Marathon or its affiliates received in arm's-length sales transactions?

d.  Can class-wide damages be calculated for Plaintiffs' theories of liability?

15.  Plaintiffs are typical of other class members because Marathon pays royalty to Plaintiffs and other Class members using a common method. Marathon pays royalty based on the net revenue Marathon receives under its gas contracts which terms royalty owners do not know or approve. The contracts are for services necessary to place the gas and its constituent parts into marketable condition so they can be sold into recognized, active, and competitive commercial markets.

16.  Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are royalty owners to whom Marathon pays royalty. Plaintiffs understand their duties as Class representatives. Plaintiffs have retained counsel competent and experienced in class action and royalty owner litigation.

17.  This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class, and those common questions predominate over any questions solely affecting individual members of such Class. *See* ¶14, above. There is no need for individual Class members to testify in order to establish Marathon's liability to or damages sustained by Plaintiffs and members of the Class.

18.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts, and/or Marathon. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

19.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of the Class. Joinder of all Class members would be either highly impracticable or impossible. And the amounts at stake for individual Class members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Marathon will likely retain the benefit of its wrongdoing.

## GAS INDUSTRY BACKGROUND

20.     The members of the Class own royalty interests in wells that produce gas and constituents that are transformed into marketable products and sold into the established commercial markets for those products.

21.     Marathon's method for calculating royalty to the members of the Class is subject to uniform accounting procedures and implied marketable product law.

22.     Oklahoma law requires the lessee to bear all of the costs of placing gas and its constituents into "Marketable Condition" products.

23.     Gas and its constituent parts are marketable products only when they are in the physical condition to be bought and sold in a commercial marketplace.

24.     Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

25.     The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology, and increased efficiency of drilling rigs, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue.

26.     But, the oil and gas companies have used undisclosed internal accounting practices to try to keep for themselves as much of the well revenue as possible. These accounting practices are at the heart of every oil and gas royalty case.

27.     Rather than adopting transparency in its royalty calculation formula, Marathon, like most lessees, has guarded its production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of information necessary to understand how Marathon calculates royalties. Consequently, the royalty owner is unaware of the lessee's actual practices, thereby enabling the lessee to breach the oil and gas lease without accountability.

28.     If and when one or more of the royalty owners learn of the "breach," the royalty owner has only three—all poor—options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since the "breach" only results in a modest yearly loss and the expense of individual litigation would exceed the recovery, if any; or (3) file a class action lawsuit which will persist for years and probably will not recover the full loss. In short, if the lessee breaches, it may never be held accountable; and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus-prejudgment interest, plus attorneys' fees and expenses. The class action is the best of the three options, hence the filing of this class action lawsuit.

### Residue Gas, Helium, Nitrogen and Natural Gas Liquids Production

29.     The gas is gathered from each well, dehydrated and compressed, through underground gathering lines crossing many miles of land to processing plants where the raw gas is transformed into two primary products--methane and fractionated natural gas

8

liquids ("NGLs"). Once homogenized as fungible products, the residue gas and NGLs are sold in the commercial market.

## Wellhead (Basic Separation and Gas Measurement)

30.    The diagram below illustrates the gas conditioning process.



*See* http://www.kgs.ku.edu/Publications/Oil/primer13.html

31.    Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[1] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due

---

[1] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[2] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly in oil and water. The heater-treater is installed, maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold (the payment of oil royalties is not at issue in this lawsuit).

32.    Since production over time depletes the pressure of a well, on rare occasion, on-lease compressors are installed to suction gas out of the well or to move the gaseous mixture down the gathering lines. But when they are installed, their use requires fuel (the "on-lease compression" or "vacuum compression" cost).

33.    The gaseous mixture produced from a single well cannot be processed economically, so the mixtures from many wells are "gathered" together through gathering lines and delivered to a processing plant for transformation into marketable products and sale into commercial markets. This results in a gathering cost (G). The below diagram provides an overview of the midstream services deduction process. Marathon does not improperly deduct from royalty any of the costs before the gathering line inlet.

---

[2] A minute portion of this raw gas may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease. Although title to the gas sometimes is purportedly transferred, this is not a true sale. Some producers sell less than 3% of the raw gas to a local irrigator during the summer months for agricultural purposes, but this is not the economic market for which the wells are drilled.

**Midstream Services (GCDTP) Deductions**



34.     As the gaseous mixture from each well enters the gathering line, it flows into a meter run where the mixture is measured for both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). The meter run must be constantly maintained to record accurate measurements.

35.     Gathering pipelines are usually made of metal that could be corroded by water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. This results in a dehydration cost (D).

36.     Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are installed to move the gas from the gathering line inlet to the processing plant. These compressors are expensive and require fuel to operate. This results in a compression cost (C).

37.     The gathering pipelines themselves cost money to lay and maintain, though most have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later. Generally lessees pay no royalty on the revenue generated from the sale of the drip condensate.

38.     Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U"). Lessees pay no royalty on the volume of L&U.

**Natural Gas Processing**

39.     Once a sufficient amount of the gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

40.     Lessees, such as Marathon, use gas processing plants that either they or a third party own. Usually an unrelated third party owns the processing plant but the plant may also be owned in whole or in part by a lessee.

41.     The plant removes impurities that remain in the mixture, such as carbon dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T)).

42.     The final cost, processing (P), involves services to transform the gas mixture into methane gas (also called "residue gas"), NGLs raw make, and in the Panhandle of Oklahoma, crude helium.

      a.     Methane must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission ("FERC") which is called "pipeline quality gas".

      b.     The raw make NGLs are used as a feedstock in the petrochemical and oil refining industries; they are a more valuable commodity than methane. To separate the NGLs from the gaseous mixture, they are cooled to temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The NGLs move into a liquids pipeline and processed by a fractionator into their marketable products: ethane; propane; butanes; and pentanes plus. In the gas contracts, this process incurs a "T&F" or "fractionation" fee, even though lessees sometimes give away the NGLs in keep-whole agreements as consideration for other services the midstream company provides.

      c.     Helium is processed into Grade A helium at new processing plants or into  crude helium (contaminated with nitrogen) at older plants which is then processed into Grade A helium at a nearby helium processor (often a few hundred feet away).

43.     This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Lessees do not pay royalty on plant fuel, even though it comes from Class Wells.

44.     At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas); and, (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). In helium rich production areas, Grade A or crude helium, along with liquefied nitrogen also emerges. But none of these products are commercially marketable at that point.

**Marketable Condition for the Products**

45.     *Methane Gas*.  Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

46.     *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products – ethane, propane, butane, isobutene, natural gasoline, etc. In computing royalty for NGLs, Marathon improperly deducts processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs.

47.     *Drip Condensate*. Drip Condensate is recovered on the gathering lines and at the inlet to the processing plant, and is essentially in marketable condition when collected.

48.     *Other Products*. In some areas of the country (e.g., in the Hugoton Field, which stretches across Southwest Kansas, the Oklahoma Panhandle, the Texas Panhandle, and into parts of Wyoming), helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other areas of the country produce sulfur and carbon dioxide in commercial quantities. When such products are available in commercial quantities, processing and treatment plants recover these valuable constituents but lessees pay little or nothing to the royalty owners. Royalty owners should be paid for the gas and all constituents taken.

### Sale of Products

49.     To turn the marketable products into money, the producer sells them (or contracts to have them sold) in the commercial market place in an arm's length transaction. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at OPIS, and any other marketable products at the prices established by their respective commercial markets. Lessees attempt to obscure this fact with self-serving language in gas marketing contracts about title transfer or even by creating a wholly owned affiliate to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

50.     The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All of the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. The difference stems from Marathon's

market power to, over time, obtain above "Index" or "OPIS" price in its arm's length sale. Whichever starting price is used in an arm's length transaction, that price is the highest and best reasonable price for the valuable gas products. If Other Products are also produced, they are and must be also priced in a commercial market.

51.     Affiliate gas contracts are not arm's-length sales in a commercial market. Instead, the later arm's-length sale by the affiliate in the commercial market is the true sale that should be used as the "starting price" for marketable condition gas products.

a.      Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists so they may justify deducting costs from royalty, or not paying for all of the gas or constituent products produced; (2) charge "marketing fees" to royalty owners even though the lessee is already obligated under the lease to prepare the gas for market and market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price and not the higher affiliate/third party price.

b.      WASP involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price." Lessees can manipulate this process by using lower lessee/affiliate sales prices

for part of the pool price, rather than all third party arm's length sale prices.

52.    Fictitious "sales" (also known as sham sales or conditional sales) are created by lessees in an effort to pass off a non-commercial market sale as if it should be the starting point for royalty payments. But none of these efforts comport with economic reality or are in good faith with respect to royalty owners. For instance:

a.    Anything of value can be sold at any place and in any condition.

b.    Gas and other minerals can and are routinely sold in the ground, but they are not in marketable condition.

c.    Gas could be sold at the bottom of the hole when it is severed from the surrounding rock and enters the downhole pipe. Although a contract driller might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his drilling services, that agreement does not make the transaction a real market sale.

d.    Gas could be sold "at the wellhead" when the gas is severed from the surface. Although a contract operator might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his well operating services, that transaction does not make it a real market sale.

e.    Gas also could be sold at the gathering line inlet when the gas enters the gathering line and changes custody. Although a contract gatherer

17

might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his gathering services, that transaction does not make it a real market sale.

f.      Gas also could be sold at the processing plant inlet when the gas changes custody to the processing plant. Although a contract processor might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his processing services, that transaction does not make it a real market sale.

g.      The lessee could simply pay for all of these services with monetary fees or in-kind contributions of all or part of the valuable constituents. But the structure of the transaction does not change the fact that the services are necessary to prepare the gas and valuable constituents for the first real sale into the commercial market – Index or OPIS.

h.      Nor does a contract saying title transfers at a custody transfer point create a sale of marketable products in a real commercial market. Some gas contracts with Midstream companies that provide GCDTP services purport to do that, but other parts of the gas contract demonstrate that it is a poorly attempted legal sleight of hand as (i) the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future downstream

services that usually passes with a true title transfer and market sale does not happen; (iii) the starting price that would occur with a true title transfer and market sale does not happen. Indeed, the paper title transfer is unnecessary to receiving the Midstream services as the gas could (and sometimes does) receive the exact same Midstream services without the paper title transfer.

i. All of the gas contracts implicitly recognize this paper title transfer fiction, as the starting price for gas products always is at the Index and OPIS market pool as previously described.

j. Midstream services providers are not buyers and resellers of raw gas. They are service providers that convert raw gas into pipeline quality gas so it can enter the Index or OPIS market pools.  Indeed, they are called Midstream servicers, not Midstream purchasers.

**Different Ways Marathon Underpays Royalty Owners**

53.    The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are firmly kept in the exclusive control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways that royalty owners are underpaid on their royalty interests, and they never know it. The common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

19

54.     Marathon represents the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed.

55.     Marathon underpays royalty to Plaintiffs and other Class Members in one or more of the following ways:

a.     <u>Residue Gas</u>. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. All of Marathon's gas contracts will show this to be true. But, instead of paying on that gross competitive price, Marathon pays on a net price after directly taking or allowing midstream companies to indirectly take Midstream Services deductions (both monetary fees and in-kind volumetric deductions).

b.     <u>NGLs</u>. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). All of Marathon's gas contracts will show this to be true. But instead of paying on that gross competitive price, Marathon pays royalty (i) for only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel); (ii) after deducting processing fees and expenses (often keeping in-kind a Percentage of the Proceeds ("POP") of the fractionated NGLs

as payment for the processing services); and, (iii) after reducing payment by T&F.

c.   <u>Drip Condensate</u>. Plaintiffs and Class Members' wells produce heavy hydrocarbons that condense in the pipeline. Marathon (or a third-party on behalf of Marathon (gatherers and/or processors)) recovers those hydrocarbons for sale. Marathon fails to pay any royalty for that Drip Condensate.

d.   <u>Other Products</u>. Helium is contained in the well-stream produced from Plaintiffs' and many Class Members' wells, but Marathon: (i) fails to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering and processing process); (ii) deducts processing fees and costs even though the helium is not yet in commercial grade; and (iii) pays at a lower than commercial Grade A price. Often times, Marathon does not pay any royalty at all for Helium, for liquid nitrogen, or other products taken from Plaintiffs' and the Class Members' wells.

56.   Marathon underpays all other Class Members, from whom Marathon is legally entitled to deduct post-production Midstream Services Costs, by taking excessive deductions under Midstream Services Contracts that allow excessive monopoly charges for GCDTP services.

## ACTUAL, KNOWING AND WILLFUL
## UNDERPAYMENT OR NON-PAYMENT OF ROYALTIES

57.     The underpayment and non-payment of royalties are done with Marathon's actual and willful knowledge and intent.

58.     In fact, Marathon settled an identical class action with an identical class definition in this Court, which class definition was certified on June 9, 2010, in *Hill v. Marathon Oil Company*, Civil Action No. CIV-08-37-R in the United States District Court for the Western District of Oklahoma.[3]

59.     However, Marathon continued to improperly pay royalty for the time period after the claims released in the class settlement agreement.

60.     In addition, Marathon is well familiar with the fact that many other producers in Oklahoma have resolved the same claims for hundreds of millions, if not billions, of dollars or have changed their royalty payment practices to cease improperly deducting.

61.     Nevertheless, Marathon continues its improper payment practices with actual and willful knowledge and intent.

## COUNT I – BREACH OF LEASE

62.     Plaintiffs and the Class incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

---

[3] At this time, Plaintiffs do not assert claims for breach of the class settlement agreement in *Hill v. Marathon Oil Company*, Civil Action No. CIV-08-37-R in the United States District Court for the Western District of Oklahoma.

63.     Plaintiffs and the other Class Members entered into written, fully executed, oil and gas leases with Marathon, and those leases include implied covenants requiring Marathon to prepare the gas and its constituent parts for market at Marathon's sole cost. The leases also place upon Marathon the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule and good faith and fair dealing.

64.     At all material times, Plaintiffs and the Class have performed their terms and obligations under the leases.

65.     Marathon breached the leases, including the implied covenants, by its actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream.

66.     As a result of Marathon's breaches, Plaintiffs and the Class have been damaged through underpayment of the actual amounts due.

## COUNT II – BREACH OF FIDUCIARY DUTY

67.     Plaintiffs and the Class incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

68.     The Class members have interests in Oklahoma wells that have united under 52 Okla. Stat. §§ 287.1-287.15 and/or 52 Okla. Stat. § 87.1.

69.     A fiduciary duty was created and vested when Marathon (or its predecessor in interest) requested and received unitization orders from the Oklahoma Corporation Commission pursuant to those statutes.

70.     Marathon is the unit operator by appointment from the Oklahoma Corporation Commission for Class members.

71.     Marathon breached its fiduciary duty to the Class members by failing to properly report, account for, and distribute gas proceeds to the Class members for their proportionate royalty share of gas production.

72.     As a direct and proximate result of Marathon's conduct in breaching its fiduciary duties, Class members are entitled to recover actual damages.

73.     Plaintiffs and the Class are also entitled to and seek pre-judgment interest, post-judgment interest, attorneys' fees from the common fund, expenses, and costs.

## COUNTS III, IV, AND V – FRAUD, DECEIT, AND CONSTRUCTIVE FRAUD

74.     Plaintiffs and the Class incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

75.     Marathon made uniform misrepresentations and/or omissions on the monthly check stubs sent to Class members reflecting the wrong volume and price, and not detailing all of the monetary fee and in-kind volumetric deductions.

76.     As set forth above, Marathon made a material representation that was false and/or omitted to state one or more material facts needed to make what was stated not misleading. Marathon knew when the material representations were made on the check stubs that the statements were false or misleading and/or at least made recklessly without any knowledge of their truth, or made the statements with the intent that Plaintiffs and the Class would rely on them. Plaintiffs and the Class Members did rely on and/or are legally presumed to have relied upon these uniform written representations as being truthful and

accurate, when they were not. Plaintiffs and the Class Members suffered injury and were underpaid as a result.

77.    Marathon also concealed or failed to disclose facts about the price, volume, value, various products produced, and deductions, which Marathon had a duty to disclose to avoid presenting half-truths or misrepresentations.

78.    Marathon undertook the duty to properly account by making the statements in check stubs on a monthly basis to royalty owners. By speaking on the issue, Marathon had a duty to make full and fair disclosure of all relevant facts. This is especially so because Marathon had superior and/or specialized knowledge and/or access to information when compared to royalty owners.

79.    Marathon knew that its representations or omissions on the monthly check stubs were at least ambiguous and created a false impression of the actual facts to the royalty owners.

80.    Marathon knew the facts were peculiarly within Marathon's knowledge and that the Class was not in a position to discover the facts pertaining to the proper volume, values, and constituents coming from their wells. Accordingly, having spoken on the subject matter, Marathon had a duty to make full and fair disclosure of all material facts such that its statements were not misleading, but did not.

81.    Marathon was deceitful by suggesting, as a fact, that the volume, price, value and other statements were as set forth on the monthly check stubs when those statements were not true. Marathon knew the statements were not true, had no reasonable

grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

82.     The misrepresentations and omissions were intentionally made. They were intended to suggest that the price was a third party commercial price without hidden deductions, the volumes were accurately measured without volumetric deductions, and that deductions would be shown on the check stub when in fact they were not.

83.     By creating and mailing misleading check stubs to the Class, Marathon has fraudulently and deceitfully misled the Class into believing that the Class Members had been paid on the full value of the production from their wells.

84.     Marathon acted intentionally or recklessly in disregard of the rights of Plaintiffs and the Class Members, on a uniform basis, by not properly paying royalty owners, by deceiving them with check stubs that were misleading, and by failing to correct Marathon's royalty payment practices after being sued multiple times for underpaying royalties such that punitive damages should be awarded and that Marathon acted intentionally and with malice toward Plaintiffs and the Class Members subjecting Marathon to punitive damages.

85.     As a direct and proximate result of Marathon's deceit and fraud, Plaintiffs and the Class were underpaid monthly for royalties and are entitled to recover actual and punitive damages.

86.     In addition, the money wrongfully obtained by Marathon as a result of what should have been paid to Plaintiffs and the Class should be held in constructive trust along with monetary interest for Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an Order and Judgment against Marathon as follows:

a.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

b.     Appointing Plaintiffs as the class representative, and Plaintiffs' Counsel as class counsel;

c.     Awarding Plaintiffs and the Class damages for actual damages for breach of lease, and interest at the highest allowable rate (such as lawful, equitable, or internal rate of return), as well as compensatory and punitive damages for breach of fiduciary duty, fraud, deceit, and constructive fraud;

d.     Granting Plaintiffs and the Class the costs of prosecuting this action together with reasonable attorney's fees out of the recovery;

e.     Granting such other relief as this Court may deem just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a jury trial on all matters so triable.

Respectfully Submitted,


s/ Reagan E. Bradford
REAGAN E. BRADFORD
OBA No. 22072
W. MARK LANIER
(*Pro Hac Vice* to be filed)
Texas State Bar No. 11934600
The Lanier Law Firm
*Houston Office*:
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
*Oklahoma Office*:
12 E. California Ave., Suite 200
Oklahoma City, OK 73104
WML@LanierLawFirm.com
Reagan.Bradford@LanierLawFirm.com

REX A. SHARP
OBA No. 011990
Rex. A. Sharp, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com

**COUNSEL FOR PLAINTIFFS**